## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Timothy J. Hoffmann assigned to the Drug Enforcement Administration (DEA), Springfield Resident Office (SRO), being duly sworn, depose and state as follows:

### I. INTRODUCTION

1. I am currently assigned to the DEA's Springfield, MA Resident Office (SRO). I was hired as a Special Agent (SA) with Drug Enforcement Administration (DEA) in 2012, and I completed my training in 2013. In connection with my duties and responsibilities as a SA, I have received extensive training in the field of narcotics investigation and enforcement. I have received training, both formal and informal, in the investigation of violations of controlled substance offenses, including attending several schools regarding general narcotics investigation. I completed the DEA Basic Agent Training Academy, located in Quantico, Virginia. I have also received specialized training related to the investigation of money laundering and other financial crimes related to drug trafficking. I have also participated in investigations relating specifically to the possession and distribution of Cocaine and Fentanyl/Heroin, the narcotic(s) involved in this investigation and discussed herein. I have also participated in various aspects of investigatory work, including but not limited to undercover surveillance and undercover narcotics purchases, and I have participated in numerous narcotics-related arrests and the execution of many narcotics-related search warrants. I have written affidavits in support of search and arrest warrants, and I frequently utilize the services of informants and other Confidential Sources of information.

2. I am familiar with narcotics traffickers= methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a

variety of other motor vehicles to: (a) meet with co-conspirators, customers and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions. Based on my training and experience, narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers. Within the United States and the District of Massachusetts, illegal drugs and drug money are most often transported in motor vehicles.

3.  I have personally participated in this investigation, which is described *infra*, since approximately January 2021. I am also familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of federal and local law enforcement agencies. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including the following:

   a. My training and experience;
   b. Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;
   c. Physical surveillance conducted by me and other federal, state, and local law enforcement agents;
   d. Confidential sources of information;
   e. Public records;
   f. Business records;

   g. Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

   h. Controlled purchases of narcotics;

   i. Queries of law enforcement records and intelligence databases;

   j. Court-authorized interception of wire and communications occurring over a cellular telephones used by Jose MENDEZ and Edward TORRES;[1]

4. This investigation has shown that MENDEZ, TORRES, and others, are distributing large amounts of heroin/fentanyl and cocaine in Western Massachusetts.

## II. PURPOSE OF AFFIDAVIT

5. I submit this Affidavit in support of an application for a complaint charging Edward TORRES with distribution of and possession with intent to distribute fentanyl in violation of 21 U.S.C. § 841(a) and (b).

6. This affidavit is based on my personal knowledge and information provided to me by other federal, state, and local law enforcement officers and that which is detailed *supra*. This affidavit is not intended to set forth all the information that I and other law enforcement personnel have learned during this investigation, but is submitted solely to provide probable cause in support of the complaint.

---

[1] In response to U.S. District Court Judge Mark G. Mastroianni's August 30, 2023 Memorandum and Order Regarding Motion to Suppress in *United States v. Daniel Augusto* (22-CR-30025-MGM, Dkt. No. 40), I hereby disclose that one or more Assistant United States Attorneys ("AUSAs") assisted in the drafting and/or editing of this affidavit. Though the United States Attorney's Office for the District of Massachusetts (the "USAO") disagrees with the *Augusto* decision and does not believe that this disclosure is necessary for the reasons stated in its September 7, 2023 motion for reconsideration in that case, I am disclosing this information out of an abundance of caution. It has long been the standard practice of the USAO for AUSAs to assist in the drafting, review, and editing of search warrant and wire affidavits.

3

### III.  FACTUAL BACKGROUND

7.  Since January of 2023, the DEA has been investigating the drug trafficking activities of the MENDEZ, TORRES, and their associates in Hampden County, Massachusetts. Using techniques and tools such as obtaining information from confidential human sources, surveillance, controlled purchases of drug evidence, phone toll analysis, pen registers, trap and trace devices, consensual monitoring of communications and court-authorized interception of wire and electronic communications, this investigation has revealed that MENDEZ, TORRES, and their associates are distributing heroin/fentanyl[2] and cocaine base in Hampden County.

*The court-authorized interception of wire communications*

8.  On August 14, 2023, the Honorable Mark G. Mastroianni, United States District Judge, issued an order authorizing the interception of wire and electronic communications occurring over a cellular telephone assigned call number 413-886-2553 ("TARGET TELEPHONE 1"), used by Jose MENDEZ and Edward TORRES.[3] The subsequent interceptions revealed that MENDEZ and TORRES were distributing large amounts of heroin/fentanyl.

9.  On October 19, 2023, the Honorable Margaret R. Guzman re-authorized the interception of wire and electronic communications occurring over TARGET TELEPHONE 1 and authorized the interception of wire and electronic communications occurring over call number 413-885-0757, used by MENDEZ ("TARGET TELEPHONE 2"), and 413-466-1890, used by MENDEZ and TORRES

---

[2] Based on my training and experience, I know that heroin sold in Western Massachusetts most commonly also contains fentanyl. It is extremely difficult, if not impossible, to differentiate between heroin and fentanyl by mere observation alone. Therefore, for the sake of clarity, rather than referring to the substance as heroin or fentanyl, I refer to the narcotics distributed by MENDEZ, TORRES, and others as "heroin/fentanyl" throughout this affidavit.

[3] *See* 23-mc-93009-MGM.

4

("TARGET TELEPHONE 3").[4] Investigators began intercepting communications occurring over TARGET TELEPHONE 1 on October 21, 2023. Investigators began intercepting communications occurring over TARGET TELEPHONE 2 on October 20, 2023. Investigators began intercepting communications occurring over TARGET TELEPHONE 3 on October 24, 2023. The interception of communications occurring over these telephones have further revealed that MENDEZ and TORRES, as well as others, distribute large quantities of heroin/fentanyl and cocaine.

### Source of Information

10.     Throughout this investigation, the DEA has utilized a Confidential Source ("CS"). The CS has been providing reliable information to the DEA in this investigation since approximately January 2023. The CS has assisted law enforcement in this and other investigations previously. Between January 2023 and August 2023, the CS has completed eleven controlled purchases from the MENDEZ Drug Trafficking Organization ("DTO") at the direction of the SRO. In all eleven controlled buys, the CS contacted the MENDEZ DTO through TARGET TELEPHONE 1. Information provided by the CS in this investigation has led to the arrest of multiple individuals and the seizure of suspected heroin/fentanyl, a firearm, and United States Currency. Further, independent law enforcement investigation has corroborated much of the information provided by the CS. SA Richard Giroux reviewed the CS's criminal history which includes: one charge of Operating Under the Influence of Liquor that resulted in dismissal, four charges of Breaking and Entering of a Vehicle/Vessel with Intent to Commit a Felony at Night, all of which resulted in dismissal, one charge of Reckless Endangerment of a Child that resulted in dismissal, one charge of Assault and Battery with a Dangerous Weapon (Automobile) that resulted in dismissal, one charge of trespassing

---

[4] *See* 23-mc-93016-MGM.

that resulted in dismissal, one charge of Assault/Battery on a family member that resulted in dismissal, one charge of Leaving the Scene of an Accident Involving Property Damage that resulted in dismissal, one charge of Negligent Operation of a Motor Vehicle that resulted in a dismissal, and one charge of Possession to Distribute heroin, which was dismissed via the filing of a *Nolle Prosequi*.[5]

11.     The CS entered into a Confidential Source agreement with the SRO and agreed to provide active cooperation in exchange for monetary compensation. As of October 19, 2023, the SRO has paid the CS $4,250.  CS has been proven to be reliable by voluntarily providing information in this investigation that the SRO has independently corroborated through investigators' observations during physical surveillance of the MENDEZ and TORRES, toll records, and controlled purchases of narcotics from the MENDEZ DTO.

### IV.     THE CURRENT INVESTIGATION

#### *TORRES arranges a drug deal with CS*

13.     During the third week of May 2023, the CS met investigators to prepare for a controlled purchase of heroin/fentanyl from the MENDEZ DTO.  At the direction of investigators, the CS exchanged text messages with TARGET TELEPHONE 1 to arrange for the purchase of heroin/fentanyl. The following is a transcript of text messages exchanged between the CS and TARGET TELEPHONE 1:

| TARGET TELEPHONE 1 | ? |

---

[5] In prior affidavits related to this investigation, the summary of CS's criminal history mistakenly cited a conviction for Operating Under the Influence of Liquor when in fact that charge was dismissed. Additionally, the affidavit omitted arrests/charges that resulted in dismissals. This omission was an oversight. I believe that this and the previous affidavits are supported by sufficient probable cause, taking into account the CS's arrests and charges that resulted in dismissals.

| CS | Ima need in the am I got my daughter rn |
|---|---|
|  | But dropping her off in the am |
| **TARGET TELEPHONE 1** | Okay lmk |

14.     Based on my training, experience, and knowledge of the case, I believe that when the CS texted TARGET TELEPHONE 1, "Ima need in the am I got my daughter rn," I believe the CS was telling the user of TARGET TELEPHONE 1 he/she wanted to purchase heroin/fentanyl the next morning. When the user of TARGET TELEPHONE 1 texted, "Okay lmk," I believe the TARGET TELEPHONE 1 was agreeing to sell the CS the heroin/fentanyl the next morning.

15.     The next morning, the CS met investigators to prepare for a controlled purchase of heroin/fentanyl from the MENDEZ DTO. At the direction of investigators, the CS called TARGET TELEPHONE 1 and spoke with TORRES. TORRES agreed to meet the CS at 332 Cherry Street, Holyoke to sell him "five," which I believe was five packs of heroin/fentanyl.[6] TFO LePage, an agent acting in an undercover capacity ("UC"), and I witnessed this call. After the call, the CS told investigators he/she believed he/she heard Joselito (MENDEZ) in the background during the conversation with TORRES. TFO LePage, the UC, and I witnessed this call. The following is a transcript of text messages exchanged between the CS and the TARGET TELEPHONE 1 during the controlled purchase:

| CS | Yo |
|---|---|
|  | Y up |

---

[6] The phone calls and text messages described happened contemporaneously to the transcribed text messages described in paragraph 54, *infra*.

7

| TARGET TELEPHONE 1 | Yo yo |
|---|---|
| CS | Bouta link u in a hour that's cool just eating breakfast with my mom then ima link u whoever u at<br><br>Wheever |
| TARGET TELEPHONE 1 | Yo |
| CS | Coming up the hill |

16.  Based on my training, experience, and knowledge of the case, I believe that the CS spoke to TORRES on TARGET TELEPHONE 1 and asked for five, the CS meant five packs of heroin/fentanyl. And, during that phone call, when TORRES agreed to meet the CS at the bus located at 332 Cherry Street, Holyoke, TORRES was agreeing to meet the CS for the purpose of selling the CS heroin/fentanyl.

17.  Investigators provided the CS with $900 of pre-recorded funds and equipped CS with an electronic listening device. Under the surveillance of investigators, the CS and the UC drove to the agreed upon meet location, the bus stop near 332 Cherry Street.

18.  Prior to arriving at the meet location, the CS texted TARGET TELEPHONE 1 to say he/she was close. Once at the meet location, the CS called TARGET TELEPHONE 1 and told TORRES he/she was there. TORRES responded he would be right out. After the call, the CS again advised investigators he/she heard Joselito (MENDEZ) in the background during the conversation with TORRES on TARGET TELEPHONE 1. The UC witnessed this call. Approximately five minutes later, the UC observed TORRES walk to the UC vehicle on foot and give the CS the suspected heroin/fentanyl in exchange for the pre-recorded funds. The UC then drove away, and the SRO terminated surveillance.

19.  Following the controlled purchase, the UC drove the CS to a predetermined location to

meet with investigators followed by TFO LePage and SA Richard Giroux. Once at the location, the CS said that "G" (TORRES) approached the UC vehicle and gave the CS the five packs in exchange for the pre-recorded funds. The CS provided SA Giroux his/her phone to review the call log and text message history, and SA Giroux confirmed the text and phone communications described above occurred between the CS's phone and TARGET TELEPHONE 1.

20. The UC gave TFO LePage the five packs of suspected heroin/fentanyl. TFO LePage examined the suspected heroin/fentanyl and determined that the packaging and appearance of the suspected heroin/fentanyl was consistent with that of heroin/fentanyl and was packaged for street-level distribution. TFO LePage further noted the suspected heroin/fentanyl was packaged in small glassine envelopes, rubber banded together in groups of approximately ten with the stamp "Polo." The DEA Northeast Laboratory analyzed the five packs of suspected heroin/fentanyl. The test yielded the substance contained the presence of fentanyl (16% plus or minus 2% purity) and caffeine.

## V. CONCLUSION

21. Based on the information set out above, I believe probable cause exists to conclude that Edward TORRES did distribute and possess with the intent to distribute fentanyl in violation of 21 U.S.C. § 841(a) and (b).

Timothy Hoffmann
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 6th day of November 2023.

                                              _/s/ Katherine A. Robertson_
                                              KATHERINE A. ROBERTSON
                                              United States Magistrate Judge